******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# IN RE TIANNA M.-M.*
## (AC 48194)

Cradle, C. J., and Clark and Keller, Js.

*Syllabus*

The respondent father appealed from the judgment of the trial court terminating his parental rights with respect to his minor child. The father claimed that the court improperly concluded that the Department of Children and Families made reasonable efforts to reunify him with his child. *Held*:

The trial court's finding that the Department of Children and Families made reasonable efforts to reunify the respondent father with his minor child was supported by clear and convincing evidence, and this court could not conclude that the department's efforts, with respect to assisting the father in addressing his history of intimate partner violence, were unreasonable merely because the department did not refer him to a specialized program for that issue, as, although intimate partner violence was a significant barrier to the father's reunification with his child, it was not the only barrier.

Argued April 24—officially released June 25, 2025**

*Procedural History*

Petition by the Commissioner of Children and Families to terminate the respondents' parental rights with respect to their minor child, brought to the Superior Court in the judicial district of Hartford, Juvenile Matters, where the case was tried to the court, *Hon. Stephen F. Frazzini*, judge trial referee; judgment terminating

---

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79a-12, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the court.

Moreover, in accordance with federal law; see 18 U.S.C. § 2265 (d) (3) (2018), as amended by the Violence Against Women Act Reauthorization Act of 2022, Pub. L. No. 117-103, § 106, 136 Stat. 49, 851; we decline to identify any person protected or sought to be protected under a protection order, protective order, or a restraining order that was issued or applied for, or others through whom that person's identity may be ascertained.

** June 25, 2025, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

the respondents' parental rights, from which the respondent father appealed to this court. *Affirmed.*

*Benjamin M. Wattenmaker*, assigned counsel, for the appellant (respondent father).

*Nisa Khan*, assistant attorney general, with whom were *Judith Chicoine*, assistant attorney general, and, on the brief, *William Tong*, attorney general, for the appellee (petitioner).

*Opinion*

CRADLE, C. J. The respondent father, Toraine M., appeals from the judgment of the trial court rendered in favor of the petitioner, the Commissioner of Children and Families, terminating his parental rights with respect to his minor child, Tianna M.-M. (Tianna).[1] On appeal, the respondent claims that the court improperly concluded that the Department of Children and Families (department) made reasonable efforts to reunify him with Tianna.[2] We affirm the judgment of the trial court.[3]

---

[1] In the same proceeding, the court also terminated by consent the parental rights of Tianna's mother. Because she has not appealed from that judgment, we refer in this opinion to Toraine M. as the respondent.

[2] On appeal, the respondent also challenges the constitutionality of General Statutes § 17a-111b (a) (2). Specifically, he argues that § 17a-111b (a) (2) is unconstitutional because that statute relieves the department of its obligation to make reasonable efforts at reunification if the court previously has approved a permanency plan other than reunification, as happened in the present case. As the respondent's counsel conceded during oral argument before this court, however, because the trial court here expressly found that the department made reasonable efforts at reunification and we affirm those findings, we need not address the respondent's constitutional claim. "As a jurisprudential matter, Connecticut courts follow the recognized policy of self-restraint and the basic judicial duty to eschew unnecessary determinations of constitutional questions." (Internal quotation marks omitted.) *In re Timothy B.*, 219 Conn. App. 823, 828 n.5, 296 A.3d 342, cert. denied, 349 Conn. 919, 318 A.3d 439 (2023).

[3] The attorney for Tianna filed a statement adopting the brief of the petitioner.

The following facts, as set forth by the trial court, and procedural history are relevant to our resolution of the respondent's claim on appeal. Tianna was born in July, 2021. Beginning in January, 2022, Tianna's mother had been "the victim of numerous incidents of domestic violence committed by the [respondent] in which [he] had slapped, bitten, choked, [broken her] nose, and given her black eyes during incidents occurring in Tianna's presence." (Internal quotation marks omitted.) The respondent was "arrested several times for family violence crimes committed against [Tianna's mother] . . . ." (Footnote omitted.) On April 22, 2022, a criminal protective order entered against the respondent, which prohibited him from having any contact with Tianna's mother or Tianna (protective order).

In December, 2022, the probate court, at the request of Tianna's mother, awarded temporary guardianship of Tianna to her maternal aunt. On February 20, 2023, while Tianna was visiting her mother, police officers, and later the department, responded to the mother's home after receiving a report that the mother had been fighting with her boyfriend, Brandon F., in the presence of Tianna. Following that incident, Tianna's aunt notified the department that she wished to relinquish her temporary guardianship of Tianna.[4] On March 13, 2023, the court, *Westbrook, J.*, granted the petitioner's motion for an ex parte order of temporary custody of Tianna and issued preliminary specific steps for the respondent to facilitate his reunification with Tianna, which included, among other things, that he (1) engage in parenting and individual counseling, (2) attend and complete an

___

[4] On March 6, 2023, the department met with Tianna's mother and some of her relatives but was unable to identify a maternal family member who was willing and suitable to care for Tianna. At that time, the department had been unable to locate the respondent, and, although the department obtained telephone numbers for the respondent two days later, it "called and texted those numbers without initially getting a response."

appropriate domestic violence program, and (3) address intimate partner violence/domestic violence with a qualified therapist.[5]

On June 13, 2023, the court, *Dannehy, J.*, adjudicated Tianna neglected and committed her to the care of the petitioner and issued final specific steps for the respondent. The final specific steps were similar to the preliminary specific steps, with a few relevant additions, namely, that the respondent (1) "[p]articipate in a [mental health evaluation] in order to assess and determine [the] level of need for [mental health] service[s]"; (2) "[e]ngage in [an intimate partner violence] program, component, or provider"; and (3) engage in supervised visitation, but "[o]nly after the protective order has been modified or no longer exists . . . ."

Judith Stewart, a department social worker, was assigned to the respondent's case in May, 2023. When Stewart met with the respondent shortly thereafter, the respondent stated that he was participating in mental health services at Wheeler Clinic and the Capitol Region Mental Health Center (Capitol Region). He further stated that he was receiving intimate partner violence services from Capitol Region. Stewart subsequently obtained a release from the respondent and attempted to contact those service providers to confirm the respondent's participation with the treatment providers. In addition, the department referred the respondent to Fatherhood Engagement Services (FES), and the respondent complied with those services, which included weekly parenting groups "working on structure, the importance of the role of a father, and the impact [that intimate partner violence] has on children." (Internal quotation

---

[5] On March 17, 2023, the respondent appeared before the court, *Nguyen-O'Dowd, J.*, and agreed to the sustaining of the order of temporary custody. On the same date, the court issued amended preliminary specific steps for the respondent, which were identical to the preliminary specific steps except for two additions that are not relevant to the issue on appeal.

marks omitted.) Furthermore, the department also encouraged the respondent to seek modification of the protective order so that it could begin offering the respondent visitation with Tianna. Although the respondent sought to modify the protective order in criminal court on two separate occasions, both requests were denied.

In November, 2023, the respondent was convicted of carrying a pistol without a permit, for which he received a sentence of five years of incarceration, execution suspended after one year of incarceration, followed by three years of probation. In December, 2023, Stewart finally received a response from Capitol Region, which informed her that it was not providing the respondent with intimate partner violence services and that it did not offer such services. After learning that the respondent, contrary to his earlier representations, had not been engaged in those services, Stewart planned to refer him to the Intimate Partner Violence-Family Assessment Intervention Response (IPV-FAIR) program at Community Health Resources (CHR) but did not do so after learning of the respondent's impending incarceration.

On December 18, 2023, the petitioner submitted a permanency plan of termination of parental rights and adoption, which was approved by the court on January 23, 2024.[6] Thereafter, in February, 2024, the respondent began serving his sentence. On March 7, 2024, the petitioner filed a petition to terminate the respondent's parental rights alleging, inter alia, that the department had made reasonable efforts to reunify the respondent with Tianna, that the respondent had failed to achieve sufficient personal rehabilitation, and that there was no ongoing parent-child relationship.[7] The termination

---

[6] The respondent did not object to the permanency plan.

[7] See footnote 1 of this opinion.

petition was tried before the court, *Hon. Stephen F. Frazzini*, judge trial referee, on August 22, 2024.

On September 19, 2024, the court rendered judgment terminating the respondent's parental rights pursuant to General Statutes § 17a-112 (j).[8] In its memorandum of decision, the court first found that the petitioner had proven by clear and convincing evidence that the department made reasonable efforts to reunify the respondent with Tianna. Specifically, the court found that "[the department] had confirmed that [the respondent] was participating in mental health services at Wheeler Clinic and [Capitol Region]; sought confirmation from [Capitol Region] that he was, as he claimed, receiving [intimate partner violence] treatment services there; after learning that his services at [Capitol Region] did not address domestic violence issues made arrangements to refer him to [the IPV-FAIR] program at CHR but could not do so because of his imminent incarceration; and referred him to the FES program." The court then found that the petitioner had proven by clear and convincing evidence that the respondent had failed to achieve a sufficient degree of personal rehabilitation,

---

[8] General Statutes § 17a-112 (j) provides in relevant part: "The Superior Court . . . may grant a petition filed pursuant to this section if it finds by clear and convincing evidence that (1) the [department] has made reasonable efforts to locate the parent and to reunify the child with the parent in accordance with subsection (a) of section 17a-111b, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts . . . (2) termination is in the best interest of the child, and (3) . . . (B) the child (i) has been found by the Superior Court . . . to have been neglected . . . in a prior proceeding . . . and the parent of such child . . . has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child; [or] . . . (D) there is no ongoing parent-child relationship, which means the relationship that ordinarily develops as a result of a parent having met on a day-to-day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child . . . ."

there was no ongoing parent-child relationship, and that termination of his parental rights was in Tianna's best interest.[9]

On appeal, the respondent claims that the court improperly concluded that the department made reasonable efforts to reunify him with Tianna. We disagree.

The following legal principles and standard of review govern our resolution of the respondent's claim. "Section 17a-112 (j) (1) requires that before terminating parental rights, the court must find by clear and convincing evidence that the department has made reasonable efforts . . . to reunify the child with the parent . . . . This court has consistently held that the [trial] court, [w]hen making its reasonable efforts determination . . . is limited to considering only those facts preceding the filing of the termination petition . . . ." (Internal quotation marks omitted.) *In re Caiden B.*, 220 Conn. App. 326, 348, 297 A.3d 1025, cert. denied, 348 Conn. 904, 301 A.3d 527 (2023).

"The word reasonable is the linchpin on which the department's efforts in a particular set of circumstances are to be adjudged, using the clear and convincing standard of proof. Neither the word reasonable nor the word efforts is, however, defined by our legislature or by the federal act from which the requirement was drawn. . . . [R]easonable efforts means doing everything reasonable, not everything possible. . . . [R]easonableness is an objective standard . . . and whether reasonable efforts have been proven depends on the

---

[9] The respondent has not challenged the court's findings with respect to the statutory grounds for termination or the best interest determination. We further note that, in rendering judgment, the court denied the respondent's motion to transfer guardianship of Tianna to her paternal grandmother, which had been consolidated for trial with the termination petition. The respondent does not challenge that portion of the court's judgment on appeal.

careful consideration of the circumstances of each individual case. . . .

"Our review of the court's reasonable efforts determination is subject to the evidentiary sufficiency standard of review [which asks] whether the trial court could have reasonably concluded, upon the facts established and the reasonable inferences drawn therefrom, that the cumulative effect of the evidence was sufficient to justify its [ultimate conclusion]. . . . In so doing, we construe the evidence in a manner most favorable to sustaining the judgment of the trial court and will not disturb the court's subordinate factual findings unless they are clearly erroneous. . . .

"In reviewing the trial court's reasonable efforts determination, this court [does] not examine the record to determine whether the trier of fact could have reached a conclusion other than the one reached. . . . In our review of the record for evidentiary sufficiency, we are mindful that, as a reviewing court, [w]e cannot retry the facts or pass upon the credibility of the witnesses. . . . Rather, [i]t is within the province of the trial court, when sitting as the fact finder, to weigh the evidence presented and determine the credibility and effect to be given the evidence." (Citation omitted; internal quotation marks omitted.) *In re Charli M.*, 229 Conn. App. 72, 79–80, 326 A.3d 1123, cert. denied, 350 Conn. 935, 327 A.3d 384 (2024).

In challenging the court's reasonable efforts determination, the respondent primarily contends that "[the department] never referred [him] to any [intimate partner violence] services at any time," which he argues was not reasonable when "[intimate partner violence] was clearly a principal barrier to reunification in this case." As noted previously, however, the department referred the respondent to FES, and through those services, the respondent attended weekly group parenting

sessions addressing, among other things, "the impact [intimate partner violence] has on children." Although the department did not refer the respondent to a specialized intimate partner violence program as it had initially intended, we reiterate that the respondent told the department that he already was receiving treatment for intimate partner violence at Capitol Region when he was not, in fact, receiving such treatment. The respondent had represented that he was already receiving treatment for intimate partner violence and, thus, there was no basis, at that time, for the department to refer the respondent to an additional program. Instead, Stewart promptly "attempted multiple times, beginning in July, 2023, to verify [that] information," as was necessary before the department could refer the respondent to an intimate partner violence program in order "to avoid a duplication of services." Because "it took a while for [Capitol Region] to get back to [Stewart]," the department did not learn that the respondent had not been receiving intimate partner violence services until December, 2023.[10] At that point, the department sought

[10] The respondent argues that the department's "six month delay in verifying whether [Capitol Region] even provides [intimate partner violence] services" was not reasonable, particularly when, according to the respondent, "such information is readily available at a moment's notice on [Capitol Region's] website" as well as a corresponding link to its informational brochure. Specifically, the respondent asserts that both resources list the services offered by Capitol Region and that neither list includes intimate partner violence treatment among those services.

The respondent acknowledges, however, that Capitol Region's website and informational brochure were not admitted into evidence before the trial court. Accordingly, the respondent asks this court to take judicial notice of those resources in support of his argument that "[the department's] failure to . . . take [the] very simple, cost free step [of checking those resources] to obtain such essential information constitutes a breach of its duty to make reasonable efforts to reunify the [respondent] with his child." In other words, the respondent asks us to take judicial notice of those materials for the purpose of weighing evidence and inferring facts. We decline to do so. See *In re Corey C.*, 198 Conn. App. 41, 62 n.18, 232 A.3d 1237 ("[W]e cannot consider evidence not available to the trial court to find adjudicative facts for the first time on appeal. . . . It is well established that this court does

to refer the respondent to the IPV-FAIR program at CHR but did not do so because it learned of the respondent's impending incarceration.[11] On the basis of the foregoing evidence, we conclude that the department's efforts, with respect to assisting the respondent in addressing his history of intimate partner violence, were not unreasonable merely because the department did not refer him to a specialized program for that issue.

Moreover, it is well established that "[o]ur courts are instructed to look to the totality of the facts and circumstances presented in each individual case in deciding whether reasonable efforts have been made." (Internal quotation marks omitted.) *In re Caiden B.*, supra, 220 Conn. App. 349–50. Thus, even if we were to assume that the respondent would have benefited from the department taking additional action to ensure that he was receiving intimate partner violence services, the department's failure to do so, by itself, would not defeat the court's reasonable efforts determination. See, e.g., *In re Ryder M.*, 211 Conn. App. 793, 812, 274 A.3d 218, cert. denied, 343 Conn. 931, 276 A.3d 433 (2022); see also *In re Charli M.*, supra, 229 Conn. App. 83 ("the question [on appeal] is not whether some evidence would support a determination that the department should have referred the respondent to an [intimate partner violence] program but, rather, whether the total-

not find facts." (Internal quotation marks omitted.)), cert. denied, 335 Conn. 930, 236 A.3d 217 (2020).

[11] In support of his claim on appeal, the respondent contends that the department still could have referred him to the IPV-FAIR program in December, 2023, so that he at least "could have received approximately two full months of services" prior to his February, 2024 incarceration. As the respondent acknowledges in his brief to this court, however, the trial court found that the department "*could not do so* because of his imminent incarceration . . . ." (Emphasis added.) The respondent has not challenged that factual finding by the court as clearly erroneous, and, even if he had, our review of the record leads us to conclude that the evidence, construed in the light most favorable to sustaining the judgment of the trial court, supports the court's finding.

ity of the evidence supports the trial court's finding that the department's reunification efforts, considered cumulatively, were reasonable").[12]

Although intimate partner violence was a significant barrier to the respondent's reunification with Tianna, as the court noted, it was not the only barrier.[13] In particular, the specific steps for the respondent reflect that unaddressed mental health concerns, which stemmed from the respondent's unresolved trauma and underlying mental health conditions,[14] presented another signif-

[12] In *In re Charli M.*, supra, 229 Conn. App. 72, the respondent father's challenge to the trial court's reasonable efforts determination, much like the respondent's challenge in this case, "focuse[d] primarily on the fact that the department did not refer him to a specialized [intimate partner violence] program" when "[intimate partner violence] was the most significant issue preventing reunification." (Internal quotation marks omitted.) Id., 82. In that case, this court noted that the department had confirmed with the respondent's therapist that intimate partner violence was being addressed in therapy, and that to the extent that those issues were not being sufficiently addressed, "it was due to [the respondent's] failure consistently to engage with his therapist . . . ." Id. Moreover, this court, in *In re Charli M.*, concluded that the respondent's argument was unavailing because the department's cumulative efforts at reunification—which included referring the respondent for supervised visitation and to a housing assistance program, a reunification readiness assessment, and FES, as well as assisting the respondent with locating a therapist and following up with his therapist regarding treatment—were sufficient to support the trial court's reasonable efforts finding. See id., 80–84.

[13] In the department's social study in support of the termination petition, which was admitted into evidence at the termination trial, the reasons for seeking termination of the respondent's parental rights, in addition to "unresolved/unaddressed intimate partner violence," were "lack of sufficient parenting skills, unresolved/unaddressed mental health, and [the fact that] he is currently incarcerated." Indeed, the court found that "the most important steps [for the respondent's reunification with Tianna] . . . related to remedying the 'parenting deficiencies' of poor decision-making, lack of insight and accountability, episodes of violence, aggression and hostility manifest in the domestic violence incidents with Tianna's mother, and not understanding his child's needs . . . ."

[14] The respondent's mental health diagnoses included "oppositional defiant disorder, other specified trauma and stressor related disorder, attention deficit/hyperactivity disorder, predominantly hyperactive/impulsive presentation, cannabis use disorder, disruptive mood dysregulation disorder, and unspecified anxiety disorder."

icant barrier to his reunification with Tianna.[15] The respondent's argument on appeal, that the department's efforts failed to sufficiently address the concerns with intimate partner violence solely because he was not referred to a specialized program to address that issue, overlooks the court's findings that the respondent's acts of intimate partner violence were symptomatic of unaddressed mental health concerns.[16] In assessing whether the department had made reasonable efforts at reunification, the court, therefore, properly considered the department's efforts related to providing the respondent with mental health services. Specifically, the court found that the department had confirmed with the respondent's individual providers that he was receiving such services, maintained communication with his clinicians to monitor his progress, and referred the respondent to FES to engage in additional mental health services. Notably, the mental health services provided to the respondent were addressing some of the underlying

---

[15] The final specific steps for the respondent included that he (1) take part in both parenting and individual counseling and make progress toward identified treatment goals, which included, inter alia, "[u]nderstand[ing] [the] impact that [mental health] . . . [has] on [a] child's development"; (2) "[p]articipate in a [mental health evaluation] in order to assess and determine [the] level of need for [mental health] service[s]"; and (3) "[t]ake part in individual counseling to gain knowledge of [mental health] diagnosis, unresolved trauma, and how it has [a] direct impact [on his] child."

[16] Specifically, the court found that "[t]he evidence . . . shows that [the respondent] has a long history of mental health issues that date back to his childhood and have repeatedly been manifest in aggressive and violent behavior." In addition, the court found that "[t]he principal barrier in [the respondent's] ability to assume a responsible position in Tianna's life at all times throughout this case has been his poor judgment and decision-making and his lack of self-control that resulted in him committing repeated acts of violence against Tianna's mother, sometimes in Tianna's presence." Finally, in concluding that termination of parental rights was in Tianna's best interest, the court found: "The respondent . . . has not addressed the underlying issues of aggression and violence that have characterized his conduct for many years and prevent him from being a suitable caretaker for Tianna. . . . [I]t is impossible to ascertain whether [the respondent] will ever . . . learn how to control his anger or whatever other emotion leads him to erupt into intimate partner violence . . . ."

issues which the court found to result in the respondent committing acts of intimate partner violence.[17] In addition, the department provided the respondent with a substance abuse evaluation[18] and case management services, which included individual meetings with department social workers, participation at large team meetings, and attendance during administrative case reviews. The court also found, however, that the respondent had only "partially complied" with the department's efforts to assist him in addressing the underlying mental health issues that were causing him to commit acts of intimate partner violence. Specifically, the court found that the respondent had been "participating in weekly therapy at Wheeler Clinic . . . [but] stopped participating there . . . [in] June, 2023 . . . and was discharged . . . in September, 2023 [for] not attending regularly." The evidence indicated that "attempts were made to [re]engage [the respondent] in services [at Wheeler Clinic] to no avail," and, although the respondent was scheduled to be readmitted in November, 2023, he "did not follow through." The court also found that the respondent "originally had weekly therapy sessions [at Capitol Region], but because of his work schedule he had been unable [to meet] that regularly and was transferred to Capitol Region's maintenance program, in which he met monthly with a clinician . . . ."

---

[17] See footnote 16 of this opinion. The respondent "was in treatment [at Capitol Region] for anxiety management" and "was also participating in weekly therapy at Wheeler Clinic to address his coping skills and anger management issues." (Internal quotation marks omitted.)

[18] The final specific steps for the respondent also included that he "[s]ubmit to a substance abuse evaluation and follow the recommendations about treatment" and that he participate in "[substance use] counseling to gain knowledge of addiction, unresolved trauma, and how it has a direct impact [on his] child . . . ." The record indicates that the respondent completed a substance abuse evaluation at Wheeler Clinic in April, 2023, and the department, after following up with the respondent's clinician, determined that further evaluation and treatment for substance use was not necessary.

Moreover, the court found that, with respect to "the most important steps [for the respondent's reunification with Tianna] . . . those related to remedying the 'parenting deficiencies' of poor decision-making, lack of insight and accountability, episodes of violence, aggression and hostility manifest in the domestic violence incidents with Tianna's mother, and not understanding his child's needs, [the respondent's] compliance has been abysmal." See *In re Nevaeh W.*, 154 Conn. App. 156, 165–66, 107 A.3d 539 (2014) (determination of whether department made reasonable efforts to reunify may be assessed in light of respondent's failure to engage in services), rev'd in part on other grounds, 317 Conn. 723, 120 A.3d 1177 (2015).

Finally, the court found that "the initial barrier to Tianna being returned to [the respondent's] custody at the time . . . [that the termination petition was filed] was the . . . protective order . . . that prohibited him from being in Tianna's presence." Indeed, the court recognized in its memorandum of decision that the respondent was "legally unable to reunite with [Tianna]" while the protective order was in place.[19] As we stated previously, the department encouraged the respondent to seek modification of the protective order, but his requests for modification were denied by the criminal court.[20] Under such circumstances, we cannot conclude, and the respondent does not contend, that there was any additional action the department could have taken to assist the respondent in overcoming that significant barrier to reunification.

---

[19] Because the respondent had been incarcerated since February, 2024, the court also noted in its memorandum of decision that, notwithstanding the protective order, "[the respondent's] current incarceration prevents reunification now . . . ."

[20] We note that the protective order was vacated in July, 2024, and the department subsequently arranged a visit between Tianna and the respondent the following month while he was incarcerated.

Accordingly, on the basis of our review of the record, we conclude that there is clear and convincing evidence to support the court's finding that the department made reasonable efforts to reunify the respondent with Tianna.

The judgment is affirmed.

In this opinion the other judges concurred.